IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | |
|---|---|
| HILLIARD, HATTIE; ADDISON, LENNEL; BENNETT, SHARON; BRAND, CODY; BROWN, DELOIS; BROWN, KIM; CALLAWAY, RACHAEL; COVINGTON, DANNY; ELLIOTT, MARY; GARRETT, NATHAN; GRAHAM, ESTERLINE; HALL, KELLY; HAMP, CAROL; HUNTER, VIRGINIA; LAYE, LINAY ON BEHALF OF JACKSON, LINDA, DECEASED; JOHNSON, SUZIE MAY; JONES, ROOSEVELT; MCCALEB, DONALD; MONROE, ANTHONY; MOSEE, JANICE; NAIDU, KRISHNAN; PROBST, KARL; REED, KRISTINA; ROBINSON, JO ANN; SMITH, CHARLOTTE; STROHM, JOCELYN, <br><br>        Plaintiffs, <br><br>BIOMET, INC. and BIOMET, ORTHOPEDICS, LLC, <br><br>        Defendants. | Case No. 3:14-cv-00434-MJR-PMF |

**COMPLAINT AND JURY DEMAND**

Come now Plaintiffs, by and through counsel, The Driscoll Firm P.C., and, upon information and belief, state the following complaint against the Defendants:

**Parties**

1. Hattie Hilliard is a citizen of the state of Illinois.

2. Lennel Addison is a citizen of the state of Michigan.

3. Sharon Bennett is a citizen of the state of Georgia.

4. Cody Brand is a citizen of the state of Arizona.

5. Delois Brown is a citizen of the state of Illinois.

6. Kim Brown is a citizen of the state of Washington.

7. Rachael Callaway is a citizen of the state of Georgia.

8. Danny Covington is a citizen of the state of North Carolina.

9. Mary Elliott is a citizen of the state of Washington.

10. Nathan Garrett is a citizen of the state of Georgia.

11. Esterline Graham is a citizen of the state of Texas.

12. Kelly Hall is a citizen of the state of Arizona.

13. Carol Hamp is a citizen of the state of Michigan.

14. Virginia Hunter is a citizen of the state of South Carolina.

15. Plaintiff Linay Laye appears on behalf of Linda Jackson, deceased, who was a resident and citizen of Pennsylvania.

16. Suzie May Johnson is a citizen of the state of Florida.

17. Roosevelt Jones is a citizen of the state of Tennessee.

18. Donald McCaleb is a citizen of the state of Louisiana.

19. Anthony Monroe is a citizen of the state of South Carolina.

20. Janice Mosee is a citizen of the state of Texas.

21. Krishnan Naidu is a citizen of the state of California.

22. Karl Probst is a citizen of the state of Utah.

23. Kristina Reed is a citizen of the state of West Virginia.

24. Jo Ann Robinson is a citizen of the state of North Carolina.

25. Charlotte Smith is a citizen of the state of Illinois.

26. Jocelyn Strohm is a citizen of the state of Montana.

27. Biomet, Inc. is a corporation organized under the laws of the state of Indiana, with

its principal place of business in the state of Indiana.

28. Biomet Orthopedics, LLC is a limited liability company organized under the laws of the state of Indiana, with its principal place of business in the state of Indiana. Biomet, Inc. is the sole member of Biomet Orthopedics, LLC, thus, for purposes of establishing diversity of citizenship, Biomet Orthopedics, LLC is a citizen of the state of Indiana.

29. Defendants manufactured, marketed, and/or distributed in the nationwide stream of commerce hip replacement devices known as the M2a 38 and/or M2a Mangum (collectively, "M2a Magnum").

## Jurisdiction and Venue

30. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31. Venue is proper in the United States District court for the Southern District of Illinois in that Plaintiff Hattie Hilliard is a citizen of and resides within the geographical jurisdiction of the Southern District of Illinois, purchased and/or used Defendants' product in the Southern District of Illinois, and/or was damaged in the Southern District of Illinois.

## Facts Common to All Counts and Parties

32. Plaintiffs are individuals who have hip replacements which, upon information and belief, were or could have been M2a Magnum devices.

33. Plaintiffs, and each of them, suffered serious physical injuries as a result of receiving such hip replacements, including but not limited to unnecessary pain and suffering; debilitating lack of mobility; metallosis; inflammation, causing damage or death to surrounding tissue and bone; a subsequent more difficult revision surgery to replace the faulty

devices, giving rise to still more debilitation, a prolonged recovery time, and/or an increased risk of death from surgery.

34. Plaintiffs assert their rights to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences, including but not limited to Defendants' actions, errors, statements, and omissions in manufacturing, marketing, and/or distributing in the nationwide stream of commerce the hip replacement system at issue, as further detailed herein. Questions of law and fact common to all Plaintiffs relating to Defendants' actions, errors, statements, and omissions will arise in this action.

**A.    The M2a Magnum Hip System Is Defective And Was Not Adequately Tested.**

35. The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the very top of the femur) rotating within the acetabulum (a cup-like structure at the bottom of the pelvis). In a healthy hip, both the femur and the acetabulum are strong and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids.

36. A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal and plastic. A typical total hip replacement system consists of four separate components: (1) a femoral stem, (2) a femoral head, (3) a plastic (polyethylene) liner, and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The femoral head is a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint when it is placed inside the polyethylene liner and acetabular shell.

37. While most hip replacements use a polyethylene plastic acetabular liner, Biomet's

M2a Magnum Hip System has a critical difference: it is a monoblock system which does not have an acetabular liner. Instead, the M2a Magnum Hip System forces metal to rub against metal with the full weight and pressure of the human body. Because of Biomet's defective design for the M2a Magnum Hip System, hundreds of patients– including Plaintiffs–have been forced to undergo surgeries to replace the failed hip implants.

38. The M2a Magnum Hip System suffers from a design or manufacturing defect that causes excessive amounts of cobalt and chromium to wear and corrode from the surface of the acetabular cup, from the femoral head, and from the taper adapter. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant. This rejection often manifests with symptoms of pain, looseness, dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often causes fluids to accumulate and soft tissues and bone to die.

39. The design of the M2a Magnum Hip System was not sufficiently tested by Biomet, and it was never approved by the FDA as being safe or effective for the product's intended purpose.

40. On numerous occasions, Biomet met with orthopedic surgeons to promote the M2a Magnum Hip System. At some or all of these meetings, a representative or representatives of Biomet was present. During these meetings, Biomet assured the orthopedic surgeons that the M2a Magnum Hip System was safe, was the best product on the market, had an excellent track record and a low and acceptable failure rate. Biomet continued to "defend" the M2a Magnum Hip Implant even after they became aware of numerous and serious complications with the M2a Magnum Hip System. Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons, including Plaintiff's orthopedic surgeon.

**B.     Biomet Sold the M2a Magnum Hip Implant To Plaintiffs After It Knew It Was Defective, That It Had Injured Others, And That It Would Injure Plaintiffs**

41.     It was not long after Biomet launched the M2a Magnum Hip System that reports of failures began flooding into Biomet.

42.     Biomet would go on to receive many similar complaints reporting that the M2a Magnum Hip System had failed and that the failure had forced patients to undergo painful and risky surgeries to remove and replace the failed hip component. To date, many reports of adverse events associated with the M2a Magnum Hip System have been filed with the FDA.

43.     By the time Biomet sold the M2a Magnum Hip System to Plaintiffs, many reports had been filed with the FDA reporting an adverse event associated with the M2a Magnum Hip System. Consequently, Biomet was fully aware that the M2a Magnum Hip System was defective and that dozens of patients had already been injured by that defect. Based on this information, Biomet should have recalled the M2a Magnum Hip System before it was sold to Plaintiffs. At a minimum, Biomet should have stopped selling the defective implant when it became aware that it had catastrophically failed in several patients.

44.     Despite its knowledge that the M2a Magnum Hip System had a defect and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, Biomet continues to sell the defective M2a Magnum Hip System. In doing so, Biomet actively concealed the known defect from doctors and patients– including Plaintiffs and their doctors–and misrepresented that the M2a Magnum Hip System was a safe and effective medical device.

45.     As numerous failures of the M2a Magnum Hip Implant were reported to

Biomet, it continued actively to promote, market and defend the defective products. For example, Biomet published marketing brochures touting the safety and durability of metal-on-metal implants and specifically, the M2a Magnum Hip System. These brochures were given to doctors around the world, including Plaintiff's orthopedic surgeon, to encourage them to use the M2a Magnum Hip System.

46. Despite its knowledge that the M2a Magnum Hip System was defective, Biomet also made several false representations about specific design elements of the M2a Magnum Hip System that they claimed made it superior to other (indeed safer) hip implants on the market.

47. Biomet's reason to conceal the defect in its M2a Magnum Hip System is clear. Hip implant sales are critically important to Biomet, and the M2a Magnum Hip System is one of its most profitable products. To this day, Biomet continues to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that have been reported to the company.

**C. Plaintiffs' M2a Magnum Hip Systems Were Defective And Failed, Forcing Most Plaintiffs To Undergo An Additional Painful And Risky Surgery.**

48. Plaintiffs herein underwent a surgical procedure to implant the M2a Magnum Hip System in their hips. At or about this time, many reports of adverse events associated with the M2a Magnum had been filed with the FDA and Biomet knew that the product was defective. But Biomet refused to disclose that information to Plaintiffs, Plaintiffs' physicians, or the public. Instead, Biomet misrepresented to Plaintiffs and Plaintiffs' orthopedic surgeon that the M2a Magnum Hip System was safe and effective. In reliance on these representations, Plaintiffs' orthopedic surgeon made the decision to use the M2a

Magnum Hip System. If it were not for the misrepresentations made by Biomet, Plaintiffs' orthopedic surgeons would not have used the M2a Magnum Hip System in Plaintiffs' hip replacement surgery.

49. As a result of the defective design, manufacture and composition of the M2a Magnum Hip System, and its accompanying warnings and instructions (or lack thereof), Plaintiffs' hip implants failed, causing severe pain.

50. Many (but not all) Plaintiffs underwent a complex, risky and painful surgery (known as a "revision surgery") to remove a failed M2a Magnum Hip System from one or both of their hips. Revision surgeries are generally more complex than the original hip replacement surgery, often because there is a reduced amount of bone in which to place the new hip implants. Revision surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a higher rate of complications.

51. Having to go through a revision surgery has subjected Plaintiffs to much greater risks of future complications than he had before the revision surgery. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent an original hip replacement surgery. In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, et al. Incidence rates of dislocation, pulmonary embolism and deep infection during the first six months after elective total hip replacement. American Journal of Bone and Joint Surgery 2003; 85:20-26.)

52. As a direct and proximate result of the failure of his defective M2a Magnum Hip System and Biomet's wrongful conduct, Plaintiffs sustained economic damages including medical and hospital expenses, severe and possibly permanent injuries, pain, suffering and emotional distress, and other damages to be determined at trial.

### Count I - Failure to Warn

53. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

54. Before Plaintiffs were implanted with the M2a Magnum Hip System, and during the period in which the device was implanted and in use by Plaintiffs, Defendants knew or had reason to know that the M2a Magnum Hip System was dangerous and created an unreasonable risk of bodily harm to consumers.

55. Defendants had a duty to exercise reasonable care to warn end users of the dangerous conditions or of the facts that made the M2a Magnum Hip System likely to be dangerous.

56. Despite the fact that Defendants knew or had reason to know that the M2a Magnum Hip System was dangerous, Defendants failed to exercise reasonable care in warning the medical community and consumers, including Plaintiffs, of the dangerous conditions and facts that made the M2a Magnum Hip System likely to be dangerous.

57. The Plaintiffs' injuries were a direct and proximate result of Defendants' failure to warn of the dangers of the M2a Magnum Hip System.

58. Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general

public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest and attorney fees, and for such other relief as this Court deems just and proper.

### Count II - Fraudulent Concealment

59. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

60. Prior to Plaintiffs' implantation with the M2a Magnum Hip System and during the period following implantation of the device until Plaintiff's revision and explant procedure on October 21, 2013, Defendants fraudulently suppressed material information regarding the safety and efficacy of the M2a Magnum Hip System, including information regarding increased adverse events. Furthermore, Defendants fraudulently concealed the safety information about the use of the M2a Magnum Hip System and its use of a metal-on-metal design. As described above, the lack of a plastic (or other non-metal) acetabular liner causes excessive wear on the metal components allowing cobalt and chromium to wear and corrode from the surface of the acetabular cup, from the femoral head, and from the taper adapter. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant. These fragments also cause fluid accumulation and soft tissue and bone necrosis. Plaintiffs believe that the fraudulent misrepresentations described herein were intentional to keep the sales volume of the M2a Magnum Hip System strong.

61. Defendants fraudulently concealed safety issues with the M2a Magnum Hip

System in order to induce physicians and surgeons to recommend the device and to induce patients, including Plaintiffs, to agree to the implantation of the M2a Magnum Hip System.

62. At the time Defendants concealed the fact that the M2a Magnum Hip System was not safe, Defendants were under a duty to communicate this information to physicians, the FDA, the healthcare community and the general public in such a manner that they could appreciate the risks associated with using the M2a Magnum Hip System.

63. Plaintiffs and the Plaintiffs' surgeons relied upon the Defendants' untruths regarding the safety of the M2a Magnum Hip System.

64. As a direct and proximate result of Defendants' intentional concealment of material life-altering information from Plaintiffs and Plaintiffs' surgeons, Defendants caused or contributed to Plaintiffs' injuries.

65. It is unconscionable and outrageous that Defendants would risk the lives of consumers. Despite this knowledge, the Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct rises to the level necessary that Plaintiffs should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

66. Defendants' fraudulent concealment tolled the statute of limitations because only Defendants knew the true dangers associated with the use of the M2a Magnum Hip System as described herein. Defendants did not disclose this information to the Plaintiffs, the prescribing doctor, the healthcare community and the general public.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest

and attorney fees, and for such other relief as this Court deems just and proper.

## Count III - Fraudulent Misrepresentation

67. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

68. Defendants, having undertaken the manufacturing, marketing, distribution and promotion of the M2a Magnum Hip System, owed a duty not to deceive the Plaintiffs, their health care providers and the public regarding the character, safety, quality and/or effectiveness of their device.

69. The duty not to deceive is distinct from the duty to warn.

70. Defendants have fraudulently misrepresented and published information in various forms of media (including, but not limited to, ad campaigns, promotional seminars, etc.) regarding their product's character, safety, quality and/or effectiveness.

71. At the time of Defendants' fraudulent misrepresentations, Plaintiffs, their surgeons, and other healthcare providers were unaware and ignorant of the falsity of the statements and reasonably believed them to be true.

72. Defendants breached their duties to Plaintiffs by providing false, incomplete and misleading information regarding the M2a Magnum Hip System.

73. Defendants acted with deliberate intent to deceive and mislead Plaintiffs, their medical providers and the public.

74. Plaintiffs reasonably relied upon Defendants' deceptive, inaccurate and fraudulent misrepresentations.

75. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiffs suffered the harm described herein.

76. Defendants' conduct was committed with knowing, conscious, wanton, willful and deliberate disregard for the value of human life and the rights and safety of patients/consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish the Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest and attorney fees, and for such other relief as this Court deems just and proper.

### Count IV – Negligence

77. Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth herein.

78. At all times herein mentioned, the Defendants had a duty to exercise reasonable care in the design, manufacture, testing, inspection, labeling, promotion, marketing and sale of the M2a Magnum Hip System to ensure that it would be safely used in a manner and for a purpose for which it was made.

79. The Defendants recklessly and/or negligently failed to exercise ordinary care in the design, manufacture, testing, inspection, labeling, pro- motion, marketing and sale of the M2a Magnum Hip System.

80. The Defendants recklessly and/or negligently made misrepresentations about the safety and effectiveness of the M2a Magnum Hip System to Plaintiffs and Plaintiffs' orthopedic surgeons. In reliance on these misrepresentations, Plaintiffs' orthopedic surgeons decided to use the M2a Magnum Hip System in Plaintiffs' surgery. If it were not for the misrepresentations by the Defendants, Plaintiffs' orthopedic surgeon would not have used the M2a Magnum Hip System in Plaintiffs' surgery.

81. The Defendants recklessly and/or negligently failed in their duty to exercise reasonable care in the provision of an adequate warning to Plaintiffs and Plaintiffs' physicians as to the risks of the M2a Magnum Hip System.

82. The Defendants recklessly and/or negligently failed to exercise reasonable care in the post-marketing warnings as to the risks of the M2a Magnum Hip System when they knew or should have known of said risks.

83. The Defendants' conduct was done in conscious disregard of the foreseeable harm caused by the M2a Magnum Hip System and in conscious disregard for the rights and safety of consumers such as Plaintiffs.

84. As a result of the Defendants' wrongful conduct, Plaintiffs suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest and attorney fees, and for such other relief as this Court deems just and proper.

## Count V - Breach of Express Warranty

85. Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth herein.

86. At all times relevant times, the Defendants expressly warranted to Plaintiffs and Plaintiffs' physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the M2a Magnum Hip System was safe, effective, fit and proper for its intended use.

87. In utilizing the M2a Magnum Hip System, Plaintiffs and Plaintiffs' physicians

relied on the skill, judgment, representations and foregoing express warranties of the Defendants.

88. Said warranties and representations were false in that the M2a Magnum Hip System was not safe and was unfit for the uses for which it was intended.

89. As a result of the foregoing breach of express warranty by the Defendants, Plaintiffs suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest and attorney fees, and for such other relief as this Court deems just and proper.

## Count VI - Breach of Implied Warranties

90. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

91. In connection with their design, testing, manufacture and sale of the M2a Magnum Hip System, the Defendants breached the warranty implied by the common law of the state of Michigan; i.e., this device was not reasonably suitable for its intended purpose because it failed prematurely; it emitted harmful metallic particles; and/or caused other harm to Plaintiffs as allged herein.

92. In connection with their design, testing, manufacture and sale of the M2a Magnum Hip System, the Defendants breached the warranty imposed by the Uniform Commercial Code and the consumer and commercial laws of the relevant states, i.e., the devices were not merchantable because they were not fit for the ordinary purposes for which such products are used.

93. In connection with their design, testing, manufacture and sale of the M2a Magnum Hip System, the Defendants breached the warranty imposed by the Uniform Commercial Code

and the consumer and commercial laws of the relevant states as, at the time of contracting, the Defendants had reason to know the particular purpose for which this device was required, and that patients, including Plaintiffs, were relying on the Defendants to furnish safe and suitable devices, yet the M2a Magnum Hip System was not fit for its particular purpose.

94. As a direct and proximate result of the breach of implied warranties by the Defendants, Plaintiff sustained and claims the damages previously set forth.

95. Plaintiff also claims consequential damages for injuries to his person proximately resulting from the breach, together with costs and actual attorney fees.

WHEREFORE, Plaintiffs demand judgment against the Defendants for that sum in excess of $75,000 which is justified by the evidence brought forth at trial, together with costs, interest and attorney fees, and for such other relief as this Court deems just and proper.

### JURY DEMAND

The Plaintiffs demand a trial by jury.

Respectfully submitted,

By:   /s/John J. Driscoll
JOHN J. DRISCOLL, #6276464
GREGORY J. PALS, #6271778
The Driscoll Firm, P.C.
211 N. Broadway, 40th Floor
St. Louis, Missouri  63102
314-932-3232 telephone
314-932-3233 facsimile
*Attorneys for Plaintiffs*